AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.    1:22-mj-84 |
| | ) | |
| Christian Wayne BURTON | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___December 2021 - January 2022___ in the county of ___Clinton___ in the
___Southern___ District of ___Ohio___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1), (b)(1)(C) | Distribution of a controlled Substance |
| 21 U.S.C. 841(a)(1), (b)(1)(B) | Possession with Intent to Distribute 50 Grams or More of a Controlled Substance Containing a Detectable Amount of Methamphetamine |

This criminal complaint is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Eric J. McIntosh, Special Agent, FBI
_Printed name and title_

Sworn to before me and signed in my presence.
**via FaceTime video**

Date:  **Feb 9, 2022**

_____
Karen L. Litkovitz
United States Magistrate Judge

City and state:  ___Cincinnati, Ohio___

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A CRIMINAL COMPLAINT**

I, Eric J. McIntosh, being duly sworn hereby and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of a criminal complaint charging Christian Wayne BURTON with two violations of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(C), distribution of a controlled substance, and one violation of Title 21, United States Code, Section 841(a)(1) and (841)(b)(1)(B), possession with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance.

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since August of 2003. As a Special Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. The Attorney General of the United States has empowered me with Title 21 authority, which authorizes me to seize property, conduct search warrants, and make arrests of persons for violations of the Controlled Substances Act.

3. I am currently assigned to the Cincinnati Field Office. My primary duties as a Special Agent consist of investigating criminal enterprises, narcotics investigations, organized crime, and violent crimes to include unlawful possession and possession with the intent to distribute of controlled substances, as well as the associated conspiracies in violation of Title 21, United States Code, Sections 841, 843, and 846. I am familiar with federal firearms laws, and investigations into possession of a firearm by a convicted felon, possessing a firearm in furtherance of a drug trafficking crime and the associated violations of Title 18, United States Code, Sections 922 and 924. As part of my standard training to become a Special Agent with the FBI, I have received

specialized training in the means and methods by which individuals and drug trafficking organizations conduct their illegal drug trafficking activities, as well as in the use of various investigative techniques used to uncover unlawful drug trafficking organizations.  Based upon my experience and training, I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their use of code words and numbers to conduct their transactions, their use of multiple telephones to conduct their illegal activities, their methods for concealing narcotics and narcotics proceeds and their use of firearms, violence, and threats of violence to protect their criminal organization.  I have received further specialized training concerning the interception of wire communications.

4.   I have participated in various types of electronic surveillance, including the interception of wire communications, in investigations of drug traffickers, money launderers and violent criminal enterprises.  I am also familiar with, and have personally participated in, other normal methods of investigating criminal enterprises, including, but not limited to, visual surveillance, the questioning of witnesses, the use of informants, undercover operations, and the use of pen registers, including pen registers in the form of digital analyzers.

5.   The facts set forth in this complaint affidavit are based on personal knowledge derived from my participation in this investigation and upon information presented to me by other law enforcement officers involved in this case to include the Warren County Drug Task Force ("WCDTF"), Wilmington Police Department ("WPD"), and other federal and state law enforcement agencies.  The sources of my information and beliefs include: oral and written reports about this and other investigations which I have received from fellow law enforcement agencies; physical and electronic surveillance of BURTON reported to me either directly or indirectly; interviews of subjects, witnesses, victims, and confidential sources; telephone communications;

and law enforcement controlled drug buys.

6. Since this affidavit is being submitted for the limited purpose of establishing probable cause authorizing the arrest of BURTON, I have not included each and every fact and circumstance I am aware of. I have set forth only those facts which I believe are necessary to establish such probable cause.

## PROBABLE CAUSE

### A. Overview of the Investigation

7. Law enforcement, including the FBI Cincinnati field office, the Warren County Drug Task Force ("WCDTF"), and the Wilmington Police Department ("WPD"), are investigating a Wilmington, Ohio area, poly-drug distribution network led by Christian Wayne BURTON.

8. In the winter of 2021, law enforcement agents learned via a trustworthy and reliable confidential source that BURTON was currently selling heroin/fentanyl. Law enforcement initiated an investigation into BURTON using law enforcement officers acting in an undercover capacity ("UCs").

9. Through a combination of investigative techniques, including electronic and physical surveillance, law enforcement identified two homes BURTON routinely stays at and uses in furtherance of his drug trafficking activities: 464 Thorne Ave., Wilmington, Ohio 45177 ("464 Thorne Ave.") and 294 South Walnut Street, Wilmington, Ohio 45177 ("294 South Walnut St."). Additionally, agents identified a 1999 tan Cadillac Escalade, Ohio license plate JDJ6354 ("Cadillac Escalade") as the vehicle BURTON uses to further his drug trafficking.

10. As I describe in more detail below, the UCs conducted two controlled purchases of controlled substances from BURTON. Later, law enforcement traffic-stopped BURTON and discovered a trafficking amount of methamphetamine hidden inside his pants.

3

**B. Undercover agents purchased fentanyl and/or methamphetamine from BURTON twice in December 2021.**

    **i.   Undercover Buy 1**

11. On December 12, 2021, UC-1 purchased approximately 3.5 grams of fentanyl from BURTON for $200 at 464 Thorne Ave. UC-1 arranged the drug transaction by contacting BURTON at cellular telephone number (937) 347-7891.[1] UC-1 and BURTON had the following text message exchange:

| UC-1 | Good to play baseBALL tomorrow? |
|---|---|
| BURTON | Yep just hit me up. |
| UC-1 | What time around the same as usual? |
| BURTON | Yea that works |
| UC-1 | Hell yeh, I'll text when I head that way |
| BURTON | [Thumbs up emoji] |

12. I know, based on my training and experience, that when UC-1 asked BURTON if BURTON was good to "play baseBALL," UC-1 was using coded language to ask whether BURTON was ready to sell UC-1 an "eight ball," meaning 3.5 grams of fentanyl.[2]

13. The next day, on December 13, 2021, at approximately 1:16 p.m., UC-1 contacted BURTON to arrange their meeting:

---

[1] (937) 347-7891 is a cellular telephone number serviced by AT&T and subscribed to Charlotte Cox, with a billing address of 294 South Walnut Street, Wilmington, Ohio 45177. Cox is BURTON's grandmother. I know, based on my training and experience, that drug traffickers frequently list family members as the subscribers. UC-1 used this number to contact BURTON throughout the investigation.

[2] I know, based on my training and experience, that drug traffickers and drug users frequently use coded language when arranging drug sales to evade detection by law enforcement. An "eight ball," which is approximately an eighth of an ounce (ranging from 3 to 3.5 grams) of an illegal drug, is a commonly used term; therefore, I believe that BURTON understood the capitalization of "baseBALL" to refer to this amount.

| UC-1 | Getting ready to roll ur way. |
|---|---|
| **BURTON** | Can you meet me at 464 Thorne**?** |

14. Following this exchange, UC-1, as surveilled by agents and officers, drove to 464 Thorne Ave., parked on the street directly across from 464 Thorne Ave., and told BURTON that UC-1 had arrived:

| UC-1 | I'm out here. |
|---|---|
| **BURTON** | Coming out |

15. A short time later, agents and officers observed BURTON[3] exit the front door of 464 Thorne Ave., walk across the street to UC-1's car, and hand UC-1 approximately 3.5 grams of fentanyl (total package weight of 4.6 grams) in exchange for $200 in pre-recorded buy money. Surveillance agents and officers then observed BURTON walk back across the street and reenter 464 Thorne Ave.

16. A field test of the purchased substance revealed it was fentanyl, a Schedule II controlled substance. Based on my training and experience, the appearance of the purchased substance, as well as the manner in which it was packaged and sold, is consistent with the substance being fentanyl. Agents processed the fentanyl as evidence and sent it to a laboratory for forensic analysis. Those results are still pending.

17. While conducting surveillance of 464 Throne Ave. on December 13, 2021, agents observed several people coming and going from 464 Thorne Ave. in a short amount of time. Based on my

---

[3] The UC and surveillance agents and officers compared the individual observed on December 13, 2021, with a state of Ohio driver's license photograph of BURTON and determined them to be one and the same.

training and experience, I believe that the activity observed during the surveillance is consistent with drug trafficking occurring from the residence.

### ii. Undercover Buy 2

18. On December 16, 2021, two UCs purchased approximately 3.5 grams of fentanyl and approximately one ounce of methamphetamine from BURTON for $550 at 294 South Walnut Street, Wilmington, Ohio 45177. UC-1 arranged the drug transaction by contacting BURTON at cellular telephone number (937) 347-7891:[4]

| UC-1 | Good for some baseBALL today around same time? |
|---|---|
| UC-1 | good for some ice cream while playin ball? |
| BURTON | Yep I got you |
| UC-1 | My dude wants to try a zip of the cream if u can and how much? |
| BURTON | 350 |
| UC-1 | 550 for both then? |
| BURTON | Yep. |
| UC-1 | U do 3 on zip if he wants more than a zip is that price all the way out? |
| BURTON | Yea I would do 3, if he got more then 1. |
| UC-1 | K, u do 3 on zip today and fire he wants more, my dude said he will make ur money if fire he will be back. |
| BURTON | He can try it first before he buys if he wants. |
| UC-1 | He said he would do 350 today if 3 on multiple later. |

---

[4] This is the same phone number BURTON used to communicate with UC-1 on December 12, 2021, and December 13, 2021, described in more detail above.

| BURTON | that's fine |
| --- | --- |
| UC-1 | Cool I'll hit you on my way. |

19. I know, based on my training and experience, that in the above text message exchange, UC-1 and BURTON arranged for UC-1 to purchase more fentanyl from BURTON, and discussed UC-1's friend's interest in purchasing methamphetamine from BURTON. Specifically, UC-1 asked BURTON if BURTON was ready to sell an "eight ball," meaning 3.5 grams of fentanyl, using the same coded language as before: "baseBALL." UC-1, after also inquiring about "ice cream," told BURTON that a friend wanted to purchase "a zip of the cream." I know, based on my training and experience, that drug traffickers and drug users use several code names to refer to methamphetamine, including "ice" and "ice cream," due to methamphetamine's crystal-like appearance. I also know that a "zip" refers to one ounce. UC-1 and BURTON then discussed prices, with BURTON offering methamphetamine at $300 per ounce if UC-1's friend purchased more than one ounce.

20. Later that same day, at approximately 1:46 p.m., UC-1 texted BURTON:

| UC-1 | Getting ready to roll ur way. |
| --- | --- |
| BURTON | Ight. |

UC-1 and UC-2 then drove to the Wilmington area, and UC-1 continued texting with BURTON:

| BURTON | I'm on Walnut |
| --- | --- |
| UC-1 | U want me to come there? |
| BURTON | Yea. |

7

21. Agents established surveillance near 294 South Walnut St. before the controlled drug purchase. Surveillance agents and officers observed BURTON sitting alone in the driver's seat of the Cadillac Escalade parked in front of 294 South Walnut St. Agents and officers observed multiple individuals separately approach the driver's side of the Cadillac Escalade and have brief interactions with BURTON before leaving the area. Based on my training and experience, I believe that those individuals were engaging in hand-to-hand drug transactions with BURTON.

22. The UCs, as surveilled by agents and officers, drove to 294 South Walnut St. and parked on the street directly across from 294 South Walnut St. Seeing the UC officers park on the street, BURTON stepped off the porch of 294 South Walnut St., walked to the driver's side of the UC vehicle, and stated "Aight, look, this ice (methamphetamine) is one gram short and the slow (heroin/fentanyl)[5] is half a gram short, but I'll have it in an hour." BURTON then handed the UC an untied bag containing approximately one ounce of methamphetamine (total package weight of 26.8 grams) and a smaller tied baggie containing approximately 3.5 grams of fentanyl (total package weight of 3.9 grams). BURTON asked, "You cool with that or what?" and UC-1 replied, "Yeah." BURTON then said, "It's 27 grams of ice and 3 grams of slow. You don't like the white shit, I'll have some gray shit in an hour, the half gram will be gray." The UCs then departed the area.

23. I know, based on my training and experience, that when BURTON said, "You don't like the white shit, I'll have some gray shit in an hour, the half gram will be gray," BURTON was referring to different types/purities of heroin/fentanyl. Drug traffickers use many different "cutting" agents to dilute the drugs to increase their profits. Because of the variety of cutting agents

---

[5] I know, based on my training and experience, that "slow" is a street term for heroin/fentanyl.

available, different sources of supply can sell the same drug, but those drugs may vary in appearance and/or potency. Therefore, BURTON's statements that he would be able to sell the UCs either "white" or "gray" fentanyl suggests that BURTON is supplied fentanyl from multiple sources.

24. A field test of the purchased substance packaged in an untied bag with a total package weight of 26.8 grams indicated the substance was methamphetamine, a Schedule II controlled substance. Based on my training and experience, the appearance of the purchased substance, as well as the manner in which it was packaged and sold, is consistent with the substance being methamphetamine. Agents processed the methamphetamine as evidence and sent it to a laboratory for forensic analysis. Those results are still pending.

25. A field test of the purchased substance packaged in the smaller tied baggie with a total package weight of 3.9 grams indicated the substance was fentanyl, a Schedule II controlled substance. Based on my training and experience, the appearance of the purchased substance, as well as the manner in which it was packaged and sold, is consistent with the substance being fentanyl. Agents processed the fentanyl as evidence and sent it to a laboratory for forensic analysis. Those results are still pending.

**C. Law enforcement seized a trafficking amount of methamphetamine from BURTON during a traffic stop in January 2022.**

26. From January 19, 2022, to present, agents have been receiving state of Ohio court-authorized global positioning system (GPS) vehicle location data for the Cadillac Escalade.[6]

27. On January 28, 2022, GPS vehicle location data for the Cadillac Escalade indicated that BURTON stopped at an ATM before traveling to 294 South Walnut St., where he stayed for

---

[6] Physical observation and surveillance confirmed that BURTON has been the sole driver of the Cadillac Escalade during this time.

approximately ten minutes. BURTON then traveled to the Dayton, Ohio area, a known source location for methamphetamine and fentanyl. After stopping at a Dayton-area residence for a little over an hour, GPS vehicle location data indicated BURTON was traveling back to Wilmington, Ohio.

28. At approximately 2:53 p.m., during BURTON's drive back to Wilmington, an Ohio State Highway Patrol ("OSHP") marked police vehicle conducted a traffic stop of BURTON's Cadillac Escalade. The OSHP Trooper identified the driver of the car as BURTON, with an adult female and adult male passenger, noting that all three individuals appeared to be nervous. The OSHP Trooper asked BURTON to exit the car so he could conduct a consensual pat down of BURTON's person. The OSHP Trooper felt brass knuckles in BURTON's right front pocket and a large bulge in the crotch area of BURTON's pants. BURTON was placed in handcuffs, advised of his *Miranda* Rights, and placed in the rear of the OSHP Trooper's vehicle. BURTON repeatedly denied having anything concealed in his pants. The OSHP Trooper removed BURTON from the OSHP patrol car and again felt the large bulge further down BURTON's pant leg. The OSHP Trooper removed BURTON's left hand from handcuffs and BURTON removed a plastic bag containing approximately four ounces of methamphetamine (total package weight of 112.0 grams). Four ounces of methamphetamine is a trafficking amount and is not consistent with personal use. Based on my training and experience, I believe the street value of this amount of methamphetamine is approximately $1,600.

29. A field test of the substance seized from BURTON indicated the substance was methamphetamine, a Schedule II controlled substance. Based on my training and experience, the appearance of the purchased substance, as well as the manner in which it was packaged and hidden on BURTON's person, is consistent with the substance being methamphetamine. Agents processed

10

the methamphetamine as evidence and sent it to a laboratory for forensic analysis. Those results are still pending. Based on my training and experience, and my review of the evidence from the traffic stop, I believe that the seized substance weighed more than 50 grams; the total package weight was 112 grams, and I know that the plastic baggie in which it was contained did not weigh more than a few grams.

30. BURTON gave consent for the search of the Cadillac Escalade and told the OSHP Trooper that there were scales in his car. I know, based on my training and experience, that drug traffickers frequently use scales to measure the drugs they receive from their sources of supply and to measure drugs to sell to users. The OSHP Trooper searched the car but did not find any other contraband; however, the OSHP Trooper noted the presence of two empty handgun holsters in the car. I know, based on my training and experience, that drug traffickers frequently carry firearms in furtherance of their drug trafficking activities.

31. Ultimately, BURTON, the adult female passenger, and the adult male passenger were released knowing possible state of Ohio drug charges would be filed. GPS vehicle location data indicated the Cadillac Escalade made a few short stops in the Wilmington area before returning to 294 South Walnut St., where the vehicle stayed overnight.

32. I know, based on my training and experience, that drug trafficking is a cash-based business; therefore, I believe BURTON's stop at an ATM prior to his trip to Dayton is consistent with obtaining a trafficking amount of methamphetamine.

## **CONCLUSION**

33. Based upon the information provided within this Affidavit, I believe that probable cause has been shown to charge Christian Wayne BURTON with two violations of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(C), distribution of a controlled substance, and one

violation of Title 21, United States Code, Section 841(a)(1) and (841)(b)(1)(B), possession with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance.


Eric J. McIntosh
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before
me this ___9___ day of February, 2022.


Karen L. Litkovitz
United States Magistrate Judge

12